**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**MISSOULA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>PERRY JAMES DIIORIO,<br><br>Defendant. | CR 26-22-M-WWM<br><br>ORDER DENYING MOTION TO SUPPRESS |

Before the Court is Defendant Perry James Diiorio's ("Mr. Diiorio") Motion to Suppress. (Doc. 29). The Grand Jury returned an indictment on April 22, 2026, charging Mr. Diiorio with attempted possession with intent to distribute methamphetamine and possession with intent to distribute methamphetamine. (Doc. 14).

Mr. Diiorio moves to suppress all evidence obtained from the search and seizure of a United States Postal Service ("USPS") Priority Mail parcel addressed to him. (Doc. 29). Mr. Diiorio contends that the parcel was unconstitutionally seized "without a reasonable and articulable suspicion that the package contained evidence of illegal activity." (Doc. 30 at 1–2). The United States opposes the motion. In its response, the government contends that there was no Fourth Amendment seizure of the package. (Doc. 33 at 2). In the alternative, it argues

that any seizure of the package was justified by reasonable suspicion and probable cause. *Id.* At the Defendant's request (Doc. 30 at 3), the Court held an evidentiary hearing on August 10, 2026.

For the following reasons, the Court denies the motion.

I. Factual Background

On Thursday, March 26, 2026, a USPS Priority Mail large flat rate box, with tracking number 9405536208303307141642, was mailed from Fallbrook, California, to Kalispell, Montana. (Doc. 35-1 at 3). The parcel was addressed to Mr. Diiorio from JPJ Collective at 9941 Alder Street in Rancho Cucamonga, California. (Doc. 35-1 at 1). A substantial percentage of interstate mail inbound to Montana arrives in Billings. After a stop in San Diego later on the 26th, Billings was the next destination for the package. (Doc. 35-1 at 2). Although shipping via Priority Mail does not guarantee an exact delivery date, the service delivery information listed Monday, March 30th as the "Service Performance Date". *Id.* Priority Mail is trackable through the tracking number assigned at the time of mailing for those with awareness of the number. USPS's website estimates that packages shipped via Priority Mail should arrive in two to three days, excluding non-mail delivery days. (Doc. 33 at 2–3); *Priority Mail*, U.S. Postal Serv., www.usps.com/ship/priority-mail.htm.

On Friday, March 27th, United States Postal Inspection Service Task Force Officer Michael Robinson ("Officer Robinson") flagged the parcel in a USPS database. *Id.* at 5. Officer Robinson has served as a law enforcement officer for twenty-three years and is a Billings Police Department Detective. For the past two years, he has been deployed as a task force officer with the Postal Inspection Service (USPIS), a component of USPS. In this role, he works as part of the Eastern Montana High Intensity Drug Trafficking Area (EMHIDTA) squad. Officer Robinson interdicts narcotics moving through the U.S. Mail.[1] To accomplish this task, he accesses USPS databases and identifies parcels with Montana addresses. Then, through additional evaluation, he culls the list by determining which parcels meet his threshold for reasonable suspicion.

Based upon his experience and training, Officer Robinson looks for certain things, including (a) how the sender paid the shipping cost and, specifically, whether it is traceable, (b) whether the origin of the parcel is from a known source state for illegal drugs, and (c) whether the label contains fictitious information about the sender or the recipient. He testified that four factors drew his attention to Mr. Diiorio's parcel for four reasons. First, the parcel came from California, a known "source state." Officer Robinson testified that California, as a border state,

---

[1] Drug trafficking through the mail is relatively common. USPIS reported seizing over 40,000 pounds of illicit drugs shipped using USPS in one year alone. *See* Office of Inspector General, United States Postal Service, Rep. No. SAT-AR-18-002 *Use of Postal Service Network to Facilitate Illicit Drug Distribution* 10 (2018).

serves as a key transit state for drugs entering the United States from Mexico. However, Officer Robinson testified that the border states are not the only source states because he also looks for parcels originating in Colorado, Utah, New Mexico, Texas, Arizona, Nevada, Washington, and Oregon when profiling packages for illegal drugs. The second reason that the parcel caught Officer Robinson's eye is because the sender paid for shipping with a form of cryptocurrency. Officer Robinson testified that it is suspicious when a sender uses either cryptocurrency or cash to mail a package because it signals that the sender wishes to be anonymous. During his time as a task force officer, he has interdicted between fifty and seventy-five parcels for which cryptocurrency served as the form of payment and, upon inspection pursuant to a search warrant, every one contained illegal drugs. The third reason was the sender's use of Priority Mail, which is trackable so that those with the tracking number may monitor the travel of the package.[2] It is also the method most commonly used by senders for the parcels that he has interdicted as a task force officer.

Finally, he found one aspect of the label to be suspicious. Officer Robinson researched the sender and recipient of the parcel using two different nationwide people search tools and Google. *Id.* at 5. He discovered that Mr. Diiorio was a

[2] The fact that the parcel was traceable as Priority Mail served as less of a basis for his determination on reasonable suspicion than the other three indicators.

real person at the listed delivery address. *Id.* However, he found that the return address - - 9941 Alder Street in Rancho Cucamonga - - was also an actual business location, but that JPJ Collective was not associated with that address.[3] Officer Robinson was unable to find a business named JPJ Collective anywhere in Rancho Cucamonga.[4] *Id.* Based upon these four factors, Officer Robinson thought that he had reasonable suspicion to stop the parcel in Billings and further investigate it. *Id.* As a result, he manually entered directions into the USPS database to cause the parcel to be sorted into a specific bin at the United States Post Office in Billings that the Postal Inspection Service has access to, rather than the bin that it would be sorted into to continue to Kalispell.

The parcel arrived in Billings and was sorted into Officer Robinson's bin at 3:33 a.m. on Saturday, March 28th. (Doc. 35-1 at 2). At this point, the package was removed from the mailstream. Officer Robinson took no additional steps on Saturday or Sunday, so instead of being forwarded to Kalispell, the parcel sat in Billings. At the hearing, Officer Robinson could not speak to what the normal course would be for a package arriving at the main post office in Billings early on a Saturday with an ultimate destination of Kalispell. However, consistent with the

[3] Officer Robinson testified that from his inspection of Google Maps Street View, 9941 Alder Street appeared to be a store front.

[4] Officer Robinson testified that it would have been suspicious had the package not identified a sender by name and included only an address. When asked whether USPS policy required the sender of the parcel to be listed as part of the return address, he was not certain, but noted that it is very uncommon to not have a name identified as the sender.

"Service Performance Date", *see* Doc. 35-1 at 2, delivery on Monday, March 30th seems like the most likely outcome in the normal course of USPS operations. This is also the most logical conclusion - - arrival of the package in Billings around 3:00 a.m. on Saturday should have allowed for it to be sorted and routed to Kalispell later that day for resorting and delivery in Kalispell on Monday. Officer Robinson demurred on whether the parcel would have been delivered by the Service Performance Date in the absence of his diversion of it because many variables can impact the timing of delivery.

Officer Robinson was not at work on Monday; he testified that it is his "off" day.[5] Therefore, Officer Robinson did not do anything with respect to the investigation on that day either. However, on Monday, United States Postal Inspector Mike Smith ("PI Smith") retrieved the parcel at the post office and transported it to the Eastern Montana High Intensity Drug Trafficking Area ("EMHIDTA") office in Billings. *Id.* at 5–6. The package remained in the EMHIDTA office overnight. Neither Officer Robinson nor Inspector Smith made additional observations after the package arrived in Billings that added to the considerations forming the government's basis for reasonable suspicion.

[5] If Monday is a day that he never works, it is less clear why he took no additional steps on Saturday or Sunday.

At approximately 8:00 in the morning of Tuesday, March 31st, Billings Police Officer Best ("Officer Best") and his K-9, Evan, came to the EMHIDTA office.[6] *Id.* at 6.[7] Inspector Smith placed the parcel on the floor of an office and covered it with a cardboard box before their arrival. *Id.* Evan found the parcel and alerted to the presence of narcotics. *Id.* Evan is trained to alert to the presence of methamphetamine, cocaine, and heroin. (Doc. 31-3 at 2). Upon Evan's positive alert, Officer Robinson applied for a search warrant later on Tuesday. (Doc. 31-1). United States Magistrate Judge Kathleen L. DeSoto granted the warrant the same day. *Id.* Officer Robinson searched the parcel in the EMHIDTA evidence room. (Doc. 31-2). He recovered approximately 1,398.45 grams of methamphetamine. *Id.*

On April 2nd, the Northwest Montana Drug Task Force and Homeland Security Investigations conducted a controlled delivery of the package after replacing the contents with "sham narcotics." (Doc. 30 at 3). Law enforcement placed the parcel in a locker attached to the USPS community mailbox at Rimrock Court in Kalispell, where Mr. Diiorio lives. *Id.* The key to the locker was placed in Mr. Diiorio's mailbox. *Id.* At about 9:45 a.m., Mr. Diiorio retrieved the key

---

[6] When Officer Robinson was asked why they had not arranged for K-9 Evan to sniff the package on Monday, he was unable to recall the reason and neither could Inspector Smith when asked by Officer Robinson.

[7] Inspector Smith arranged for the K-9 to come to the EMHIDTA office to see whether he would alert to the existence of drugs in the parcel. It is not clear when he made the request to Officer Best.

from his mailbox and collected the parcel. *Id.* Law enforcement arrested Mr. Diiorio upon his possession of the parcel. *Id.*

II. Legal Standard

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has repeatedly affirmed that "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Heien v. North Carolina*, 574 U.S. 54, 60 (2014).

In order to effectuate the Fourth Amendment's protection, defendants have the right to have any evidence secured by means of an unlawful search and seizure excluded from trial, upon motion and proof. *Simmons v. United States*, 390 U.S. 377, 389 (1968) (citing *Weeks v. United States*, 232 U.S. 383 (1914)); Fed. R. Crim. P. 12(b)(3)(C). Characterized as "fruit of the poisonous tree," evidence seized as a result of an unlawful search or seizure is subject to exclusion unless it has been sufficiently "purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 485-88 (1963). A defendant has the ultimate burden of proof on a Fourth Amendment motion to suppress. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005).

III. Discussion

In his opening brief, Mr. Diiorio asserts that the unconstitutional conduct

"occurred prior to application for an execution of [the search] warrant," (Doc. 30 at 2), and that he is "more concerned" with law enforcement activity before the search of the package than after the issuance of the warrant (Doc 30 at 4). Mr. Diiorio identified the "initial seizure" of the package by Postal Inspector Smith, but also its removal from the mailstream "as an interference with [his] possessory interest." (Doc. 30 at 7). He supports the allegation by arguing that law enforcement did not have reasonable suspicion to divert the parcel from the path it would have otherwise traveled. Mr. Diiorio compares the factors observed by officers leading to detention of a package in *United States v. Hernandez*, 313 F.3d 1206 (9th Cir. 2002) to what Officer Robinson found in this case and argues that "there was an almost complete absence of particularized facts to support the initial seizure." (Doc. 30 at 10). Mr. Diiorio argues that in the absence of reasonable suspicion, the conduct of the government violated the Fourth Amendment's prohibition on unreasonable seizures, which led to an unreasonable search. He demands suppression of the fruits of all of the evidence collected by the government.

The prosecution disagrees with each of Mr. Diiorio's points. First, it disputes that law enforcement officers ever seized the parcel. It characterizes the officers' possession of the parcel after they diverted it from the mailstream as a "brief retention" (Doc. 33 at 2). The government further alleges that Mr. Diiorio

never had a possessory interest in the parcel. Finally, the prosecution posits that law enforcement had a reasonable suspicion to detain the package if, in fact, Mr. Diiorio had a possessory interest in it and a seizure occurred. The prosecution also notes that Mr. Diiorio does not contend that the government's actions delayed the parcel "beyond its expected delivery date". (Doc. 33 at 7). It frames Defendant's argument as one limited to the reasonable suspicion inquiry (i.e., either Officer Robinson had reasonable suspicion at the point he diverted the parcel from the mailstream, or he did not and because he did not (and never developed additional indicia of suspicion) there was no basis for the diversion). If the government is correct about the scope of Defendant's argument, the Court need not reach conclusions about whether the delivery was unduly prolonged. The government further noted that Mr. Diiorio does not challenge whether it established probable cause once K9 Evan alerted to the package's contents on the morning of Tuesday, the 31st. (Doc. 33 at 10).

"Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable." *United States v. Jacobsen*, 466 U.S. 109, 114 (1984). An addressee has both a possessory and a privacy interest in what has been mailed. *United States v. Jefferson,* 566 F.3d 928, 933 (9th Cir. 2009) (quoting *Hernandez*, 313 F.3d at 1209). The addressee's

privacy interest does not extend to the exterior of a mailed package. *See United States v. Hoang*, 486 F.3d 1156, 1159–60 (9th Cir. 2007) ("the Fourth Amendment is not implicated when only the external features of a package, like the address label are examined; there is no reasonable expectation that the outside of a package given to a mail-carrier will be kept private"). "Although a person has a legitimate interest that a mailed package will not be opened and searched en route, there can be no reasonable expectation that postal service employees will not handle the package or that they will not view its exterior." *Hernandez*, 313 F.3d at 1209-10 (cleaned up). "Similarly, the Fourth Amendment is not implicated by the use of a dog sniff by a trained dog to detect contraband in a package." *Hoang*, 486 F.3d at 1160 (citing *Illinois v. Caballes*, 543 U.S. 405, 408-10 (2005)).

Thus, neither the visual inspection of Mr. Diiorio's package, research of the sender and recipient information, nor the dog sniff were searches within the meaning of the Fourth Amendment. Mr. Diiorio does not claim that his privacy interest in the contents of the mailed package was violated. (Doc. 30 at 7). In the absence of any assertion by Defendant of the deprivation of his privacy interest by the government, Mr. Diiorio is limited to a claim with respect to his possessory interest. *Hoang*, 486 F.3d at 1160 ("[b]ecause there was no search, the only constitutional interest potentially implicated is Hoang's possessory interest in the package.").

Mr. Diiorio contends that "the initial seizure of the package," and removal from the mailstream was "an unreasonable interference with Mr. Diiorio's possessory interest in the mailed package" because it was not supported by reasonable suspicion. *Id.* Whether a seizure has occurred depends on the extent of the interference with Defendant's possessory interest in the property. *United States v. England*, 971 F.2d 419, 420 (9th Cir. 1992) (citing *Jacobsen*, 466 U.S. at 113)). There is no Fourth Amendment seizure where the delivery of a package is not delayed. *Id.* at 421; *Hoang*, 486 F.3d at 1162 ("no seizure occurs if a package is detained in a manner that does not significantly interfere with its timely delivery in the normal course of business."). For example, had K9 Evan been deployed on Saturday, the 28th to see if he alerted on the parcel's contents and the controlled delivery in Kalispell followed on Monday, the 30th, no delay would have been occasioned by virtue of its detention. Once the delivery time has passed, law enforcement must justify further detention with "reasonable and articulable suspicion." *Hoang*, 486 F.3d at 1160.

*a. Whether the package was "seized" prior to the dog sniff.*

In its briefing, the government argues that there was no seizure of Mr. Diiorio's package prior to the dog sniff because it would not have arrived in Kalispell by the time the dog sniff occurred. (Doc. 33 at 6). It contends that the

package arrived in Billings on March 30, 2026,[8] and Inspector Smith removed it from the post office and requested the dog sniff the next day. *Id.* ("there is little possibility the package would have been delivered by 8 am the following day, given that it arrived in Billings that day and that its ultimate destination was Kalispell"). Given that the package arrived in Billings on Saturday instead of Monday, the government's argument is narrowed to a contention that there is no clarity on whether the package would have been delivered before Evan detected drugs in the parcel early on Tuesday, the 31st. Mr. Diiorio argues for a different calculation. If the package was delivered to his address on April 2nd and its expected delivery was March 30th, it follows that the package was seized. (Doc. 34 at 4). In short, Mr. Diiorio believes that a seizure occurred on Saturday, the 28th when the package was diverted from the mailstream to a bin assigned to USPIS. Ninth Circuit precedent provides no support for this argument.

When the Postal Service has guaranteed a date and time for the arrival of a package, as with Express Mail, the recipient has no possessory interest until that time has passed. *Jefferson*, 566 F.3d at 934.[9] In this case, the Priority Mail

---

[8] The government made this representation in its response brief. In Mr. Diiorio's reply, he attached the USPS tracking information that confirms the package arrived in Billings on March 28th. (Doc. 35-1 at 2). At the hearing, counsel for the government identified this error and asked the Court to disregard its representation that the package arrived in Billings on March 30th.

[9] Another Ninth Circuit case involving detention of a parcel has more sweeping language with respect to a recipient's Fourth Amendment interests - - "a reasonable expectation that the

package directed to Mr. Diiorio had no guaranteed delivery time. The United States takes the position that the lack of a guaranteed delivery time deprives Defendant of a possessory interest. It argues that the facts in this case preclude Mr. Diiorio from arguing that the government effected a seizure. At the same time, it concedes that a longer period of diversion from the mailstream - - say thirty days, *see United States v. Dass*, 849 F.2d 414 (9th Cir. 1988) - - would constitute an unconstitutional seizure. This point is consistent with more aged authority from a time in which USPS had no Express Mail option, and it makes clear that a prolonged detention of a parcel "could at some point become an unreasonable seizure." *United States v. Van Leeuwen*, 397 U.S. 249, 252-53 (1970); *United States v. Aldaz,* 921 F.2d 227, 229 (9th Cir. 1990); *see also*, *Hernandez*, 313 F.3d at 1212 ("Even if the initial seizure of a mailed package is based on reasonable suspicion, a prolonged detention is unreasonable under the Fourth Amendment.").

The Defendant's timely delivery argument is further undermined by Ninth Circuit authority expressing a general tolerance for deliveries that might not occur close to the timeframe projected by the Postal Service. Even with Express Mail, the predominant "Fourth Amendment interest in a mailed package attaches to the privacy of its contents, not the speed with which it is delivered." *United States v.*

---

mail will not be detained by postal employees beyond the normal delivery date and time," *Hernandez*, 313 F.3d at 1210 - - , but the case also involves an Express Mail parcel.

*Gill*, 280 F.3d 923, 929 (9th Cir. 2002) (quoting *United States v. Hillison*, 733 F.2d 692, 696 (9th Cir. 1984)).

If a recipient of an Express Mail parcel is not entitled to a possessory interest until the date and time for the delivery has passed, it follows that Mr. Diiorio had no possessory interest until the end of the business day on Monday, the 30th, at the earliest.

Does Mr. Diiorio lack a possessory interest merely because USPS has not made a commitment regarding the time of delivery for the parcel? If the recipient of a Priority Express package with a guaranteed delivery date and time has no possessory interest before that time has passed, a recipient of a Priority Mail package is entitled to no more extensive possessory interest in his package. The *Jefferson* panel relied upon the contractual guarantee made by the USPS with respect to the time of delivery of an Express Mail parcel to find that "a possessory interest derives from rights in property delineated by the parameters of law, in this case, contract law." *Jefferson*, 566 F.3d at 934 (citation omitted). In the Priority Mail context, in the absence of a binding contractual term, what needs to occur before the addressee develops a possessory interest and are there particular factors that should be considered to make that determination?

No bright line test establishes the length of time a package may reasonably be detained without a Fourth Amendment violation. To be applied on a case-by-

case basis, the test is, "Based upon the facts, was the delay in handling the package[] unreasonable?" *Hernandez*, 313 F.3d at 1212 (quoting *Aldaz*, 921 F.2d at 230). In *Hernandez*, the Ninth Circuit measured the "interference with [the defendant's] possessory interest caused by the delay" between the "earliest time of delivery [of the express mail]" and the time the canine was called for a sniff. 313 F.3d at 1213. A different Ninth Circuit panel concluded that "the relevant time period is that between the initial detention and that at which probable cause is developed because '[p]robable cause is sufficient to support the subsequent detention of the package.'" *United States v. Lozano*, 623 F.3d 1055, 1061 (9th Cir. 2010) (internal quotations omitted).

Mr. Diiorio did not have a guaranteed delivery date or time because his parcel was shipped via Priority Mail, rather than Express Mail. However, given that the parcel arrived in Billings on Saturday, Monday, the 30th would have been the most likely date for its delivery in the absence of the diversion from the mailstream.[10] This is consistent with the USPS's general guidance that a parcel will arrive within two to three days from mailing, excluding non-mail delivery days. *See Priority Mail*, U.S. Postal Serv., https://www.usps.com/ship/priority-mail.htm. It is also consistent with the projection provided by USPS with respect

[10] By the time a package has made it to Montana, the probability of delay in the delivery is substantially reduced. By Saturday morning, there was no risk that the parcel got mishandled and sent somewhere other than Montana.

to the parcel at issue mailed to Mr. Diiorio. (*See also* Doc. 35-1 at 2). Because the parcel was shipped on Thursday, March 26th and arrived in Montana on Saturday, the 28th, it should have been delivered by Monday, March 30th. Had the canine sniff occurred on the weekend or even early Monday, delivery on the projected timetable could have occurred. Therefore, by the end of the day on March 30th, the parcel was "seized" for purposes of the Fourth Amendment. At that point, the "constitutional chemistry," *see Jefferson*, 566 F.3d at 935, was altered and law enforcement was required to have reasonable suspicion justifying further detention of Mr. Diiorio's parcel.

The United States has argued that the only question preserved by Defendant is whether Inspector Smith and Officer Robinson had reasonable suspicion to detain the package. The Court concludes that Mr. Diiorio's argument is not so narrow. After hearing testimony at the suppression hearing, his counsel noted that the parcel got diverted from the mailstream on Saturday, but the government conducted no further investigation, including the deployment of K-9 Evan, until Tuesday, for which there is no explanation. Mr. Diiorio asserts that this is significant given that he expected the parcel to be delivered on Monday. Counsel for Mr. Diiorio made this argument after the close of the evidentiary record at the hearing, and it is preserved as part of Defendant's argument in this case.

In addition to its argument that there was no seizure in this case, the United

States asserts that any detention of the parcel was brief. The argument that law enforcement officers only briefly retained the package seems misplaced on these facts. The decision to divert the parcel was made before the weekend, effectuated by the automated package handling system very early on Saturday, March 28th, and not presented for evaluation by the drug dog until Tuesday, March 31st. Even if the package was not seized until the date of the projected delivery (Monday), nearly a full day passed before K-9 Evan's detection of drugs established probable cause.

Having determined that the parcel was seized late on March 30th, the Court now turns to the remaining issue: whether the seizure of Mr. Diiorio's parcel was justified by reasonable suspicion.

*b. Whether the seizure was justified by reasonable suspicion.*

Even when a seizure has occurred, the Court must evaluate, "the reasonableness of that act . . . by weighing the public interest against the protected private interest." *Hoang*, 486 F.3d at 1159 (citation omitted). Although mail is protected by the Fourth Amendment from unreasonable search and seizure, it is not beyond the reach of all inspection. *Van Leeuwen*, 397 U.S. at 251–52. The threshold consideration for the Court is "whether the initial detention of the package was based on reasonable suspicion." *Hernandez*, 313 F.3d at 1210. Postal Inspectors may "seize and detain" a package to conduct an investigation "if

they have a reasonable and articulable suspicion" that it contains contraband or evidence of illegal activity. *Aldaz*, 921 F.2d at 229. Whether reasonable suspicion existed for delay in delivery of the parcel is determined by considering the totality of the circumstances, and it is not controlled by "whether the Government pursued the least intrusive course of action." *Hernandez*, 313 F.3d at 1213.

To determine whether reasonable suspicion exists, courts "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing as understood by those versed in the field of law enforcement." *Lozano*, 623 F.3d at 1060 (citations omitted). For this reason, the Court may not consider each factor in isolation. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Reasonable suspicion may exist even if each factor, standing alone, could be consistent with innocent behavior. *Id.* at 277. On the other hand, it would not be adequate if an officer acted on a "mere hunch" to establish reasonable suspicion. *Id.* at 274.

For a law enforcement officer's determination to be legally viable, the indicia of suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence," which is far less than probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Courts must be mindful that law enforcement officers are entitled to deference in assessing facts in context and

through the application of their specialized training and experience. *Arvizu*, 534 U.S. at 276; *Hernandez*, 313 F.3d at 1210-11.

Mr. Diiorio argues that Officer Robinson's report does not articulate any facts that support reasonable suspicion. (Doc. 30 at 8). He distinguishes *Hernandez* by pointing out that the addresses on the label of his package were legitimate, the parcel was shipped by USPS Priority Mail, the label was typed, and the parcel was appropriately packaged. *Id.* at 9. Mr. Diiorio contends that the simple fact that the package was paid for in cryptocurrency and came from California is not enough to support reasonable suspicion. *Id.* at 10.

The government counters that though the factors are different from *Hernandez*, reasonable suspicion existed. (Doc. 33 at 9–10). First, it points out that the listed sender was not a real business, nor was it associated with the listed address. *Id.* at 9. Second, the package was sent via Priority Mail, which offers faster delivery than several other shipping options. *Id.* Lastly, the package's postage was paid for with cryptocurrency, which provides the sender anonymity. *Id.* Thus, the government argues that reasonable suspicion justified seizing the package long enough to conduct a dog sniff. *Id.* at 10. Once Evan, the K-9, alerted to the presence of narcotics, probable cause was established. *Id.*

One district judge reviewed cases to inventory factors identified by Postal Inspectors that heighten their suspicions that a parcel may contain contraband. Her

list included:

> Shipping by Priority Express Mail;
>
> Handwriting the addresses on the mailing labels rather than using typed mailing labels;
>
> Shipping from a known source state;
>
> Shipping to a location to which narcotics have been commonly shipped in recent years;
>
> Paying for the postage in cash;
>
> Providing inaccurate and/or incomplete information on the mailing label, including false names or telephone numbers;
>
> Heavily taping the outside of the package and sealing the seams;
>
> Densely packing the inside of the parcel and packing the narcotics inside multiple envelopes or packages within the parcel;
>
> Vacuum sealing narcotics inside the parcel; and,
>
> Packing strong smelling substances along with the controlled substances in order to mask odors.

*United States v. Williams*, 349 F.Supp.3d 1007, 1013 (D. Haw. 2018) (citing *Gill*, 280 F.3d at 926; *United States v. Huerta*, 655 F.3d 806, 808 (8th Cir. 2011)); *see also*, *Hernandez*, 313 F.3d at 1210 (sender could not be verified at the return address); *Lozano*, 623 F.3d at 1060 (shipped with delivery confirmation service).

These cases provide support for the four factors relied upon by Officer Robinson to divert the parcel.

1. The Label Contained Fictitious Information Regarding the Sender.

Using data available to Postal Inspectors, Officer Robinson concluded that JPJ Collective was a bogus entity. He relied on this conclusion as part of his indicia of suspicion. His conclusion is suspect for two reasons. First, his testimony regarding the address seems incorrect. In addition, it is unclear whether he scrutinized the name of the sender because he understood Postal regulations to require a sender to be named. Reliance on the name of the entity identified as the sender as a component of Officer Robinson's indicia of suspicion deserves scrutiny in this case. First, he testified that from his inspection of Google Maps Street View, 9941 Alder Street appeared to be a store front. The Court takes judicial notice, pursuant to Federal Rule of Evidence 201, that 9941 Alder Street appears to be a residence, not a store front, when viewed on Google Maps Street View. *See also United States v. Perea-Rey*, 680 F.3d 1179, 1182 n. 1 (9th Cir. 2012) (taking judicial notice of a location identified via Google satellite imaging and maps). In addition, USPS regulations do not require that the name of the sender be identified on a Priority Mail item. *See* United States Postal Service, *Mailing Standards of the United States Postal Service, Domestic Mail Manual* 602.1.5.2; *see also* 39 CFR 111.1(a)(2)(ii) (incorporating by reference the *Domestic Mail Manual*).

To the extent either misimpression formed a basis for reasonable suspicion, the factor may have had greater weight than deserved. On the other hand, as the

Supreme Court noted in *Miranda*, "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence," "Volunteered statements of any kind are not barred by the Fifth Amendment . . . ." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). Similarly, when nothing requires a person to make any statement, but he makes one anyway, an officer is justified in relying on that statement to form reasonable suspicion if he determines the statement is false.

2. The Parcel Originated in California.

Identifying parcels from California as suspect due to the state's reputation has been recognized by courts in the West when considering an officer's indicia of suspicion of drug trafficking. In *Hernandez*, the Court noted, "the fact that the package had been mailed from California, a known drug-source state, heightened [the agent's] concern." *Hernandez,* 313 F.3d at 1211; *see, also, Williams*, 349 F. Supp. 3d at 1013–14; *United States v. Dawson*, 2026 U.S. Dist. LEXIS 8941, *7 (D. Haw. 2026). It is clear that Officer Robinson's suspicion about California as a source for illegal drugs is widely shared.

3. The Sender Used Cryptocurrency to Pay to Mail the Parcel.

In *Williams*, Judge Gillmor noted that cash payments have contributed to reasonable suspicion for Postal Inspectors focused on drug interdiction. 349 F. Supp. 3d at 1014. Officer Robinson noted that he has intercepted a large number

of packages where the USPS charges were paid with cryptocurrency. In each instance, the parcel contained illegal drugs. It is unsurprising that the fact that sender paid the postage with cryptocurrency contributed to Officer Robinson's suspicion.

4. The Sender Utilized a Mail Service That is Trackable.

Although Officer Robinson gave it less weight than the other three factors, the sender's utilization of a USPS product with delivery confirmation contributed to his suspicion. Once again, this factor has been observed by courts as a basis for an officer's conduct with respect to detention of parcels. *Id.* at 1013; *Lozano*, 623 F.3d at 1060.

The Court has considered whether the factors found by a law enforcement officer to form a basis for reasonable suspicion could be non-specific or generally applicable to a broad swath of mail so as to provide no meaningful threshold on the question. On this point, in his response brief, Mr. Diiorio notes the prevalence of cryptocurrency in the modern economy and the fact that California's economy is larger than many prosperous nations. (Doc. 34 at 5). The Court concludes that the four factors, taken together, meet the low bar required for reasonable suspicion.

IV. Conclusion

For these reasons, the Court finds that law enforcement did not violate Mr. Diiorio's Fourth Amendment rights when they detained his parcel beyond its

delivery date. The government's investigation substantiated facts that led to reasonable suspicion on the part of Officer Robinson. None of the evidence obtained as a result of the seizure and its subsequent search will be precluded at trial.

**IT IS HEREBY ORDERED** that Mr. Diiorio's Motion to Suppress (Doc. 29) is denied.

The Clerk of Court is directed to notify the parties of the making of this Order.

DATED this 18th day of September, 2026.

WILLIAM W. MERCER
UNITED STATES DISTRICT JUDGE